**OWNER–OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.; Gerald Webb; David Rush; Wayne Bibicoff; Roy Sparks; Olin Sparks; Paul Hawkins; David Hayes; Valarie Helton; John Nunn, Sr.; Frank Carter, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,**

v.

**SWIFT TRANSPORTATION CO., INC. (AZ); Swift Transportation Co., Inc.(NV); Ms Carriers, Inc.; Ms Carriers Warehousing & Distribution, Inc., Defendants–Appellees.**

No. 03–15735.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2003.

Decided May 12, 2004.

James A. Moody, Washington, DC; Randall D. Wilkins, Bonn & Wilkins, Chartered, Phoenix, AZ; Daniel R. Unumb, Paul D. Cullen, Sr., Cullen Law Firm, Washington, DC, for the appellants.

Richard M. Paul, III, and James C. Sullivan, Shughart, Thompson & Kilroy, Kansas City, MO; Brian Michael Goodwin and Paul M. Briggs, Shughart, Thompson & Kilroy, Phoenix, AZ, for the appellees.

Appeal from the United States District Court for the District of Arizona Paul G. Rosenblatt, District Judge, Presiding. D.C. No. CV–02–01059–PGR.

Before: CANBY, W. FLETCHER, and TALLMAN, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge.

The plaintiffs in this class action are independent truck drivers, known in the trucking industry as "owner-operators," and an association of owner-operators. Defendants are federally regulated motor carriers that contract with owner-operators to transport cargo across the country. Federal "Truth–in–Leasing" regulations require that motor carriers and owner-operators enter into written leases that explicitly address certain contractual issues, such as compensation and duration. Plaintiffs contended that defendants' standard form lease agreements failed to comply with the Truth–in–Leasing regulations in various respects, and moved for a preliminary injunction. The district court applied the "traditional" balancing test to the motion, and denied it.

Plaintiffs appeal, asserting that the district court committed an error of law by applying the traditional equity balancing test to their motion. They contend that the district court should have granted the motion for injunctive relief upon a showing of "reasonable cause" to believe that defendants' leases violated the Truth–in–Leasing regulations. We disagree. The proposed "reasonable cause" test applies only when Congress makes clear its intent to depart from the traditional equity bal-

ancing test used to grant or deny preliminary injunctions. Because Congress has not made such an intent clear, we apply the traditional test. Under that test, we affirm the district court.

## I. Background

There are hundreds of thousands of owner-operators in the United States, many of whom contract with various federally regulated motor carriers. Under federal law, motor carriers are required to register with the Department of Transportation ("DOT") in order to ship most types of cargo in interstate commerce. 49 U.S.C. §§ 13901, 13902; 49 C.F.R. § 367.4 ("Requirements for registration"). Once registered, these carriers are statutorily obliged to comply with certain regulations promulgated by the DOT. 49 U.S.C. § 13902(a)(1); 49 C.F.R. § 367.7. A primary goal of this regulatory scheme is to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position. For example, the statute authorizes the DOT to require that all leases between motor carriers and owner-operators be in writing and contain certain basic information, such as the duration of the lease and the compensation to be paid the owner-operator. 49 U.S.C. § 14102(a); *see* 49 C.F.R. § 376.11(a) (requiring that leases be in writing); *id.* § 376.12(b) (requiring that leases "specify the time and date ... on which the lease begins and ends"); *id.* § 376.12(d) (requiring that the amount to be paid to the owner-operator be "clearly stated on the face of the lease").

The Truth-in-Leasing regulations, 49 C.F.R. Part 376, were originally promulgated and enforced by the Interstate Commerce Commission. When Congress abolished the Commission in 1995, it placed enforcement responsibility with the owner-operators by enacting a statute that provides a private right of action for violations of the Truth-in-Leasing regulations. *See*

49 U.S.C. § 14704(a). In that statute, Congress expressly provided that, in addition to seeking damages, a party injured due to a violation of the Truth-in-Leasing regulations "may bring a civil action for injunctive relief." *Id.*

Plaintiffs brought a class action pursuant to § 14704(a) against several motor carriers alleging that the carriers' standard form lease agreements violate the Truth-in-Leasing regulations in various respects. For example, they alleged that defendants' form lease agreements do not clearly state the amount the owner-operator is to be paid. *See* 49 C.F.R. § 376.12(d) (requiring a clear statement on the face of the lease of the owner-operator's compensation). A week after filing their class action complaint, plaintiffs moved to preliminarily enjoin defendant motor carriers from contracting with owner-operators until they executed lease agreements that complied with the Truth-in-Leasing regulations.

Plaintiffs argued to the district court that they had established "reasonable cause" to believe that defendants were shipping cargo in violation of the Truth-in-Leasing regulations, and that they were therefore entitled to a preliminary injunction. Plaintiffs asserted that this reasonable cause standard, rather than the traditional equity balancing test, governed their motion. *Compare Burlington N. R.R. Co. v. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992) (describing the "reasonable cause" test), *with Miller v. California Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir.1994) (en banc) (describing the traditional equity balancing test). The district court rejected plaintiffs' argument and applied the traditional equitable balancing test. It denied a preliminary injunction under that test, concluding that

plaintiffs are not entitled to the issuance of a preliminary injunction ... because

they have not established through the evidence of the record either that they will suffer any irreparable harm if the injunction is not granted or that their legal remedies are inadequate.

Plaintiffs appeal the district court's ruling that the traditional equitable balancing test governs their motion. They do not, however, appeal the district court's conclusion that, under the traditional test, they are not entitled to the preliminary injunction they seek.

## II. Discussion

■ Federal courts usually apply "traditional" equitable principles to petitions for injunctive relief that seek to prevent or deter statutory violations. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (collecting Supreme Court 6169 cases). "The essence of equity jurisdiction has been the power ... to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *see also, e.g., City of Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–38, 53 S.Ct. 602, 77 L.Ed. 1208 (1933) ("an injunction is not a remedy which issues as of course"). This "equity practice" has "a background of several hundred years of history," *Hecht*, 321 U.S. at 329, 64 S.Ct. 587, and still guides the federal courts today. *See, e.g., Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 423 (2d Cir.2004) (quoting *Hecht*, 321 U.S. at 329, 64 S.Ct. 587).

■ We have established the following "traditional equitable criteria" for deciding whether to grant a preliminary injunction:

(1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief. The moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.

*Miller*, 19 F.3d at 456 (citations and quotation marks omitted); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") (citing, *inter alia, Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 561, 14 L.Ed. 249 (1851)).

■ Congress, however, has the power to alter the traditional equitable balancing test. If Congress wishes to do so, it can require the federal courts to automatically enjoin actual or imminent violations of a statute without an individualized balancing of the equities. *Romero–Barcelo*, 456 U.S. at 313, 102 S.Ct. 1798. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("*TVA v. Hill*"), is the leading case sustaining such a congressional restriction of the courts' equitable discretion.

In *TVA v. Hill*, plaintiffs brought suit under the federal Endangered Species Act ("ESA") seeking to enjoin the TVA from finishing a nearly-completed dam on the Little Tennessee River. Under the ESA, all federal agencies—including the TVA—are obliged to " 'tak[e] such action neces-

sary to insure that [they] do not jeopardize the continued existence of [any] endangered species.' " *Id.* at 160, 98 S.Ct. 2279 (quoting the ESA, 16 U.S.C. § 1536 (1976)). The damming of the Little Tennessee would have flooded the only known habitat of the snail darter, a small fish that had very recently been declared an endangered species. Such flooding would have destroyed the snail darter's "critical habitat," *id.* at 171, 98 S.Ct. 2279, in violation of the ESA's "flat ban" on destruction of the critical habitats of endangered species. *See Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 543 n. 9, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (explaining *TVA v. Hill*). Nevertheless, the district court denied plaintiffs' motion for a preliminary injunction on the ground that the snail darter's continued existence was outweighed by considerations on the other side, notably the tens of millions of dollars already expended in constructing the dam that would be wasted by stopping the project. *TVA v. Hill,* 437 U.S. at 166–67, 98 S.Ct. 2279.

The Supreme Court held that the district court erred by using the traditional equitable balancing test. *Id.* at 194–95, 98 S.Ct. 2279. The Court held that Congress "had chosen the snail darter over the dam" and thereby "foreclosed the exercise of the usual discretion possessed by a court of equity." *Romero–Barcelo,* 456 U.S. at 313–14, 102 S.Ct. 1798 (explaining *TVA v. Hill*). Any reconsideration of congressional priorities—*i.e.,* whether to choose the snail darter or the dam—by the federal judiciary would violate the constitutional principle of separation of powers. Once Congress "has decided the order of priorities in a given area," said the Court, "it is [merely] for the courts to enforce them when enforcement is sought." *TVA v. Hill,* 437 U.S. at 194, 98 S.Ct. 2279; *see also id.* at 194–95, 98 S.Ct. 2279 ("We do not sit as a committee of review, nor are we vested with the power of veto" over

Congress). Therefore, the district court was obliged by the statute to issue the injunction against the completion of the dam, regardless of the costs or consequences of doing so, and regardless of the result that it would have reached under the traditional equitable balancing test.

*TVA v. Hill* makes clear that Congress has the power to restrict the federal courts' traditional equitable discretion. However, because of the long and established history of equity practice, "we do not lightly assume that Congress has intended to depart from established principles [of equitable discretion]." *Romero–Barcelo,* 456 U.S. at 313, 102 S.Ct. 1798 (citing *Hecht,* 321 U.S. at 329, 64 S.Ct. 587). Therefore, "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Miller v. French,* 530 U.S. 327, 340–41, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000); *Romero–Barcelo,* 456 U.S. at 313, 102 S.Ct. 1798 (quoting *Porter*); *Califano v. Yamasaki,* 442 U.S. 682, 705, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction.").

The Supreme Court and this court have frequently held that various congressional statutes do *not* restrict the federal courts' traditional equitable discretion to determine the appropriateness of injunctive relief. *See, e.g., Gambell,* 480 U.S. at 544, 107 S.Ct. 1396 (Alaska National Interest Lands Conservation Act); *Romero–Barcelo,* 456 U.S. at 320, 102 S.Ct. 1798 (Federal Water Pollution Control Act); *Hecht,* 321 U.S. at 330, 64 S.Ct. 587, 88 L.Ed. 754 (Emergency Price Control Act); *Alaska*

*Wilderness Recreation & Tourism Assoc. v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995) (National Environmental Policy Act and Alaska National Interest Lands Conservation Act); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 313 (9th Cir.1982) (Internal Revenue Code). *But see TVA v. Hill*, 437 U.S. at 194–95, 98 S.Ct. 2279 (Endangered Species Act); *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir.1983) (Railroad Revitalization and Regulatory Reform Act).

For example, in *Romero–Barcelo*, plaintiffs brought suit under the Federal Water Pollution Control Act ("FWPCA") to enjoin the United States Navy from using actual ordnance during aerial combat exercises on and near Vieques Island, Puerto Rico. 456 U.S. at 306–07, 102 S.Ct. 1798. The district court found the Navy had violated the FWPCA "by discharging ordnance into the waters surrounding the island without first obtaining a permit from the Environmental Protection Agency," but, after balancing the equities (in particular the public interest in well-trained Navy pilots), it declined to issue an injunction against the Navy's operations at issue. *Id.* at 308–10, 102 S.Ct. 1798. The First Circuit, relying on *TVA v. Hill*, "concluded that the District Court erred in undertaking a traditional balancing of the parties' competing interests," rather than simply enjoining the Navy once it was shown to be in violation of the FWPCA. *Id.* at 310–11, 102 S.Ct. 1798.

The Supreme Court, however, distinguished *TVA v. Hill* and reversed the First Circuit. The Court stated,"The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.* at 313, 102 S.Ct. 1798. Furthermore, it was clear from the statutory scheme that Congress did not intend to curtail the exercise of traditional equitable discretion by the courts. *Id.* at 314–18, 102 S.Ct. 1798 (noting that, in addition to injunctive relief, Congress provided for "fines and criminal penalties," "phased compliance" of the FWPCA, and a rule of "immediate cessation" that only applied to a certain class of violations). Thus, Congress had not " 'in so many words, or by a necessary and inescapable inference, restrict[ed] the court's jurisdiction in equity.' " *Id.* at 313, 102 S.Ct. 1798 (quoting *Porter*, 328 U.S. at 398, 66 S.Ct. 1086). Moreover, the Court observed, Congress's goal in passing the FWPCA was to preserve the "integrity of the Nation's waters," and the statutory permit process was but a means to an end. *Id.* at 314, 66 S.Ct. 1086. Declining, in the name of equity, to enjoin every violation of the statute would therefore not flout the congressional purpose underlying the FWPCA. *Id.* at 314–15, 66 S.Ct. 1086.

Similarly, in *Gambell*, plaintiffs sued to enjoin the Secretary of the Interior from making certain sales of oil and gas leases in Alaska. They asserted that the Secretary had failed to comply with § 810 of the Alaska National Interest Lands Conservation Act ("ANILCA") in making these sales. *Gambell*, 480 U.S. at 535, 107 S.Ct. 1396. Section 810 required the Secretary to follow certain procedures (such as providing notice and holding public hearings) before making such sales, in order to protect natural resources in Alaska for the benefit of indigenous people. Applying the traditional equitable balancing test, the district court denied plaintiffs' motion for a preliminary injunction against certain exploratory activities and one of the lease sales. *Id.* at 539–40, 107 S.Ct. 1396.

On interlocutory appeal, we reversed. *People of Gambell v. Hodel*, 774 F.2d 1414 (9th Cir.1985). We held that the district

court had erred in applying traditional equitable principles because, under then-controlling circuit precedent, " '[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action' " and, therefore, "injunctive relief is the appropriate remedy for a violation of an environmental statute absent rare or unusual circumstances." *Id.* at 1423 (quoting *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1250 (9th Cir.1984)). The Supreme Court reversed us for the same two reasons it had earlier reversed the First Circuit in *Romero–Barcelo.* 480 U.S. at 544–46, 107 S.Ct. 1396. First, with respect to congressional intent, the Court held that "[t]here is no clear indication in § 810 that Congress intended to deny federal district courts their traditional equitable discretion in enforcing the provision." *Id.* at 544, 107 S.Ct. 1396. Second, the Court held that we made the same error the First Circuit had made in *Romero–Barcelo,* namely "focus[ing] on the statutory *procedure* rather than on the underlying substantive policy the process was designed to effect—preservation of subsistence resources." *Id.* at 544, 107 S.Ct. 1396. The Supreme Court therefore declared that traditional equitable principles apply to the granting of injunctive relief under § 810. *Id.* at 544–45, 107 S.Ct. 1396.

■ Plaintiffs urge us to hold that this is one of the rare cases in which Congress has directed the federal courts to depart from traditional equitable principles. They argue that Congress clearly intended to restrict the courts' traditional equitable discretion with respect to actual or imminent violations of the Truth–in–Leasing regulations. In their view, if a plaintiff demonstrates reasonable cause for the court to believe that a violation of the Truth–in–Leasing regulations is occurring or is about to occur, a district court must grant a preliminary injunction to stop or prevent such violation. *See generally*

*Bair,* 957 F.2d at 603 (so holding with respect to the Railroad Revitalization and Regulatory Reform Act). In other words, plaintiffs argue for what is known as the "reasonable cause" test. *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen,* 640 F.2d 255, 260 (10th Cir.1981).

We disagree with the plaintiffs that the reasonable cause test applies to injunctive enforcement of the Truth–in–Leasing regulations. Congress has not clearly indicated an intent to restrict the courts' equitable discretion in enforcing these regulations. The relevant statutory language is as follows: "A person injured because a carrier [violates the Truth–in–Leasing regulations] may bring a civil action to enforce[the regulations]. *A person may bring a civil action for injunctive relief for violations [thereof].*" 49 U.S.C. § 14704(a)(1) (emphasis added). While this language clearly authorizes injunctive relief, it plainly does not, "in so many words, or by a necessary and inescapable inference," require an injunction to issue to prevent violations of the Truth–in–Leasing regulations irrespective of traditional equitable considerations. *Porter,* 328 U.S. at 398, 66 S.Ct. 1086; *see TVA v. Hill,* 437 U.S. at 193, 98 S.Ct. 2279 ("a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law"); *Hecht,* 321 U.S. at 329, 64 S.Ct. 587 (a "grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances"); *see generally Brown v. Swann,* 35 U.S. (10 Pet.) 497, 503, 9 L.Ed. 508 (1838) ("The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.").

Plaintiffs contend that the Truth–in–Leasing regulations constitute a "flat ban" against providing transportation services

under non-conforming leases, analogous to the ESA's "flat ban" on destroying the critical habitats of endangered species. *Romero–Barcelo,* 456 U.S. at 314, 102 S.Ct. 1798 (describing the ESA as a "flat ban"). Because Congress has established a flat ban, they argue, the courts are not at liberty to overturn this policy preference and to allow motor carriers to violate that ban.

This argument proves too much. Many (perhaps nearly all) regulatory statutes can be described as constituting a "flat ban" against certain conduct, but it is well established that the federal courts are "not mechanically obligated to grant an injunction for every violation of law." *TVA v. Hill,* 437 U.S. at 193, 98 S.Ct. 2279. For example, the statute at issue in *Gambell* mandated that "[n]o ... lease ... which would significantly restrict subsistence uses shall be effected until the [Secretary of the Interior] gives notice to ... the appropriate local committees ... and holds a hearing in the vicinity of the area involved ..." 480 U.S. at 535 n. 2, 107 S.Ct. 1396. Under the plaintiffs' argument, this statute constitutes a "flat ban" against the Secretary granting a lease without complying with the various procedural requirements, and would support issuance of a preliminary injunction under the reasonable cause test. The Supreme Court held, however, that the district court was correct to apply traditional equitable principles in deciding whether to enjoin a lease sale made without complying with these procedural requirements, despite this "flat ban." *Id.* at 539–46, 107 S.Ct. 1396.

We observe that *Gambell* and *Romero–Barcelo* instruct the courts to "focus[ ] ... on the underlying substantive policy" when considering whether to invoke the reasonable cause test. *Gambell,* 480 U.S. at 544, 107 S.Ct. 1396; *Romero–Barcelo,* 456 U.S. at 314–18, 102 S.Ct. 1798. Congress's substantive purpose in authorizing the Truth–in–Leasing regulations was to protect owner-operators. The method selected to achieve this goal was to require that certain terms be included in every lease between carriers and owner-operators. The district court below came to the entirely sensible conclusion that the plaintiff class of owner-operators would be adequately protected, within the intent of the statute, through the application of the traditional equitable test for preliminary injunction.

Finally, plaintiffs direct our attention to *Owner–Operator Indep. Drivers Assoc., Inc. v. Ledar Transp.,* 2000 WL 33711271 (W.D.Mo. Nov.3, 2000). In *Ledar,* the court applied the reasonable cause test to a motion for injunctive relief brought pursuant to the Truth–in–Leasing regulations. The *Ledar* court supported its conclusion that "Congress has already balanced the equities with regard to the Truth–in–Leasing regulations" on three bases: (1) "Congress has devoted a substantial amount of time and effort to this issue," *id.* at \*2 (recounting legislative history); (2)"the purpose of the Truth–in–Leasing provisions [would] be served by the issuance of [a] preliminary injunction," *id.* at \*3; and (3) the "regulations place a 'flat ban' on entering into lease agreements which do not comply [there]with." *Id.* at \*4. Because none of these grounds relate to the dispositive question of whether Congress intended to displace traditional equitable principles, however, we believe that *Ledar* was wrongly decided.

### Conclusion

We hold that Congress did not restrict the courts' traditional equitable powers with respect to violations of the Truth–in–Leasing regulations. The district court therefore did not err in applying traditional equitable principles to plaintiffs' motion for a preliminary injunction. Because the plaintiffs declined to appeal the district

court's application of the traditional standard, the district court's denial of the preliminary injunction is AFFIRMED.